UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Civil No. 10-1961 (ADM/FLN)

Rochelle L. Bistodeau,

        Plaintiff,

v.                                    **REPORT AND RECOMMENDATION**

Michael J. Astrue,
Commissioner of Social Security,

        Defendant

_____

Neut L. Strandemo, Esq., for Plaintiff

Lonnie F. Bryan, Assistant United States Attorney, for Defendant

_____

Plaintiff Rochelle Bistodeau seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").   See 42 U.S.C. § 1382(c).  The matter was referred to the undersigned United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  This Court has jurisdiction over the claims pursuant to 42 U.S.C. § 405(g).  The parties submitted cross-motions for summary judgment. (Doc. Nos. 12, 18.)  For the reasons which follow, this Court recommends that Plaintiff's motion for summary judgment be denied, and Defendant's motion for summary judgment be granted.

# I.   INTRODUCTION

Plaintiff filed applications for SSI and DIB on January 21, 2007 and April 17, 2007, respectively. (Tr. 96-98, 99-100). For DIB purposes, she alleged an onset of disability on July 27, 2006. (Tr. 99). Plaintiff's date last insured was December 31, 2006. (Tr. 13). Plaintiff's applications were denied initially and upon reconsideration. (Tr. 54-58, 60-65). Plaintiff requested a hearing before an administrative law judge ("ALJ"), and the hearing was held on May 28, 2009. (Tr. 66-68, 24-41). On July 29, 2009, the ALJ issued a decision denying Plaintiff's claims. (Tr. 7-23). The Appeals Council denied Plaintiff's request for review on March 4, 2010 (Tr. 1-5), making the ALJ's decision final for purposes of judicial review. See 20 C.F.R. §§ 404.981, 416.1481. Plaintiff commenced this action seeking judicial review of the Commissioner's decision on May 4, 2010.

# II.   STATEMENT OF FACTS

## A.   Background

Plaintiff alleges disability from the following impairments: fibromyalgia, PTSD, bipolar II disorder, and degenerative disc disease. (Tr. 138). Plaintiff's birthday is January 18, 1970, and she was 36-years-old on the onset date, July 27, 2006. (Tr. 96). She has a high school education. (Tr. 147). Her last job was in customer service at an insurance agency from 2000-2001. (Tr. 139). Plaintiff quit her job in June 2001 due to chronic pain. (Tr. 138).

## B.   Medical Records

Plaintiff saw Physician Assistant ("P.A.") Elizabeth Hedlund at Fairview Cedar Ridge Clinic on February 7, 2006, and reported that she had lost twenty-five pounds with exercise and diet, but her shins were sore with extra walking. (Tr. 246). She had symptoms of "RLS" including trouble

sleeping and her legs shaking.  (Id.)  Hedlund advised Plaintiff she could take the following medications on a daily basis:  Naproxen, Amitriptyline, Neurontin and Ultram. (Tr. 248).  Hedlund encouraged Plaintiff to continue exercising.  (Id.)

On April 7, 2006, Plaintiff provided Hedlund with two forms to be filled out regarding her fibromyalgia.  (Tr. 244).  Hedlund noted Plaintiff believed she was limited in work and travel due to pain.  (Tr. 244-45).  Plaintiff appeared well on examination and her affect was positive and pleasant.  (Tr. 246).

Ten days later, Hedlund examined Plaintiff. (Tr. 240-43).  Plaintiff's complaints were minor GI symptoms and fibromyalgia, which was "doing well recently." (Tr. 243).  Hedlund noted a history of depression and anxiety but that Plaintiff was doing well.  (Id.)  Plaintiff's physical examination was normal, her mentation appeared normal and affect was normal and bright.  (Tr. 243-44).

Plaintiff saw Dr. Lea Hogan at Ridgeview Medical on April 25, 2006, and reported that all of her friends said she needed to see a psychiatrist.  (Tr. 223).  Plaintiff complained of depression, paranoia and fibromyalgia pain.  (Id.) On objective examination, Dr. Hogan noted Plaintiff appeared very disorganized with poor hygiene and disheveled hair, rapid and pressured speech, and agitation.  (Id.)  Her impression was histrionic borderline personality disorder, possible/probable bipolar II, PTSD, and GAD [generalized anxiety disorder].  (Id.)  Dr. Hogan noted Plaintiff had an SSDI hearing the next day.  (Id.)  She wrote, "[Plaintiff] definitely qualifies for SSDI- very disorganized and depression."  (Id.)  Plaintiff failed to show for her next several appointments with Dr. Hogan. (Tr. 222).

Plaintiff presented Hedlund with disability forms for completion on May 11, 2006. (Tr. 238). Hedlund noted Dr. Hogan had diagnosed bipolar II and had started medications of Lexapro, Depakote and Risperdal.  (Id.)  Plaintiff also reported that she had PTSD.  (Id.)  Objectively, Hedlund observed, "Well appearing; NAD; vitals stable; Affect is positive.  Thought form and content are normal." (Tr. 239).  Hedlund stated she would ask Dr. Hogan to complete the disability forms.  (Tr. 240).

On May 31, 2006, Plaintiff saw Hedlund for increased neck pain and ringing of the ears.  (Tr. 233).  Objectively, Plaintiff appeared well, her spine was nontender, reflexes, strength and sensation were normal.  (Tr. 235).

Plaintiff went to the Hennepin County Medical Center on July 28, 2006, for anxiety and pain. (Tr. 404).  Plaintiff said she ached all over without relief from her medications, but a nurse noted Plaintiff's affect was bright, she moved freely, and she was laughing and talking on the phone.  (Id.) She reported she had been raising three children on her own until the past December, when her husband gained custody. (Tr. 405).  She had recently left her dad's house because he was verbally abusive, and she was staying at the Salvation Army.  (Id.)  She rated her fibromyalgia pain as ten out of ten, but she left before seeing a physician.  (Tr. 404-05).

Plaintiff was taken by ambulance to the Fairview-University Medical Center on August 4, 2006, with symptoms of difficulty breathing and anxiety.  (Tr. 301).  Plaintiff had been living in a homeless shelter for three weeks and had been abused by her boyfriend.  (Tr. 303).  She had run out of Depakote two days earlier.  (Id.)  Dr. Truong restarted Depakote and recommended follow up therapy.  (Tr. 304).

4

On August 12, 2006, Plaintiff was brought to North Memorial Health Care ("North Memorial") because her family wanted to commit her for psychiatric instability. (Tr. 314). On mental status examination, Plaintiff exhibited some pressured and tangential speech but was otherwise normal. (Tr. 314). Dr. Rebecca Ansari stated:

> Given the stories told by family, I am really concerned that the patient is engaging in behaviors that are dangerous to her, and at this point qualifies for unable to care for self secondary to psychiatric disease. I think she probably does have bipolar disorder as recently diagnosed and needs a lot more attention to getting some balance to that before being discharged to home.

(Tr. 314). Plaintiff was admitted to the hospital. (Id.)

Dr. Mark Erpelding at North Memorial also evaluated Plaintiff. (Tr. 308-09). He stated, "[n]otes show increased episodes of excessive spending and promiscuity, and then she seems to get depressed. Apparently ran out of her Depakote a couple of weeks ago, and now has been getting worse." (Tr. 308). Plaintiff admitted to another physician that spending money was a trigger for her mood swings. (Tr. 310). However, Plaintiff denied hypersexuality and dangerous behavior. (Id.) Dr. Erpelding noted Plaintiff had been living at Harbor Lights recently, and she was evicted from her apartment in November 2005. (Tr. 309).

Physically, Plaintiff reported that she had fibromyalgia with increasing pain in the arms and legs. (Tr. 309). She tried to swim and "do small activities" to help her fibromyalgia. (Id.) Dr. Erpelding stated Plaintiff had decompensated bipolar disorder with recent possible manic activity, and her fibromyalgia was stable. (Id.)

Dr. Zaheer Aslam also evaluated Plaintiff. (Tr. 310-12). Plaintiff said she was in the hospital for anxiety and panic attacks. (Tr. 310). She said her mood had been more stable lately, but she had mood swings from high to low once or twice a month. (Id.) On mental status

examination, Plaintiff was disheveled, her affect was restricted and judgment and insight were poor. (Tr. 311.)  However, her mood was fine and her mental status examination, including memory and attention, were normal.  (Id.)  Plaintiff admitted having anxiety episodes after she quit taking Depakote two weeks earlier.  (Id.)  Plaintiff denied the symptoms described by her family but later admitted doing things that were "unsafe."  (Tr. 310, 313).  She had recently been in jail for assault and was put on suicide watch.  (Tr. 313).  Dr. Aslam diagnosed bipolar disorder, type II and assessed a GAF score of 35.[1]  (Tr. 311-12).

Plaintiff was seen by Dr. John Vancini on August 16, 2006.  (Tr. 318-22).  Plaintiff was "sweet" and "pleasant" but also vague and evasive.  (Tr. 318).  Plaintiff reported she intended to leave when the hold on her was up, but her family had filed a petition for commitment.  (Id.)  Dr. Vancini noted Plaintiff took a number of tests "compliantly enough."  (Tr. 319).  Her Pre-Shipley IQ estimate was 80, between borderline functioning and low average.  (Id.)  Dr. Vancini saw evidence that 80 was an underestimate of her potential.  (Id.)  Her MMPI-2 results were "adequately valid."  (Id.)

Dr. Vancini agreed with others "who noted [Plaintiff] has been non-disclosing, in denial, guarded, showing impaired judgment and lack of appropriate self-care."  (Tr. 321).  Dr. Vancini

---

[1]  The Global Assessment of Functioning "GAF" is a numeric scale of 0-100 used by mental health practitioners to subjectively rate the social, occupational and psychological functioning of adults.  Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text revision Am. Psychiatric Ass'n 2000).  A score between 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.  Id. at 34.  A score between 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood.  Id.  A score between 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  Id.  A score between 51-60 indicates moderate symptoms or moderate difficulty in social, occupational or school functioning.  Id.

6

noted Plaintiff's diagnosis from April was bipolar disorder II, but he questioned whether it might be bipolar disorder with psychotic features. (Id.) He also suspected impulse controlled disorder and intermittent explosive disorder. (Id.) He estimated a GAF score of 20-30, and stated she was much less functional than she would like one to believe. (Id.) Her recommended further exploration of her chemical use. (Id.)

Plaintiff was discharged on August 18, 2006. (Tr. 316-17). Dr. Dennis Philander noted that the hospital petitioned for a court commitment but was denied because Plaintiff did not present a "potential threat." (Tr. 316). Dr. Philander stated Plaintiff had certainly decompensated, as evidenced by three incarcerations for violation of a restraining order, and three recent emergency room hospitalizations. (Id.) He diagnosed bipolar disorder, type II. (Tr. 317).

Plaintiff saw Dr. Floyd Anderson at Associated Clinic of Psychology for a psychiatric evaluation on September 26, 2006. (Tr. 285-87). Plaintiff reported her life was going fairly well with her marriage and three children until she learned of her husband's three-year affair. (Tr. 285). Later, she had become homeless and was jailed on more than one occasion. (Id.) Her children were taken away from her in January of that year. (Id.) She needed a psychiatric evaluation to restore primary custody of her children. (Id.)

Plaintiff ran out of antidepressant medication three weeks ago. (Id.) She believed her problems arose from her divorce, but also that she inherited "nervous difficulties" from both sides of her family. (Tr. 286). In the last two years, she had some mild difficulty with alcohol. (Id.)

Plaintiff had a high school education. (Id.) She was currently homeless and staying in a shelter. (Id.) On mental status examination, her grooming and eye contact were good. (Id.) Her intelligence was estimated as average and her speech was not pressured, with no flight of ideas. (Id.)

The provisional diagnoses were history of bipolar disorder, rule out PTSD, panic disorder with agoraphobia, probable personality disorder with avoidant, borderline and anxiety features, and a GAF score of 50.  (Id.)  Dr. Anderson noted outpatient therapy would be difficult for Plaintiff because it took her three hours to get there by bus.  (Tr. 287).

On October 6, 2006, P.A. Hedlund completed a Medical Opinion form for Plaintiff.  (Tr. 289).  She opined that Plaintiff was permanently disabled by chronic pain and mood instability, with diagnoses of fibromyalgia and bipolar II.  (Id.)

Plaintiff presented to North Memorial for worsening depression on October 10, 2006, and saw Dr. James Tyson and Dr. Jeffrey Michell.  (Tr. 323).  She had been off Effexor for three weeks..  (Id.)  Her symptoms were trouble concentrating, decreased appetite, fatigue, insomnia, and sadness.  (Id.)  Her mental status examination was normal.  (Tr. 324).  She did not meet the criteria for admission, and she was given a prescription for Effexor.  (Id.)

On December 13, 2006, Plaintiff underwent a diagnostic assessment with Dr. Ali Ebrammi at Associated Clinic of Psychology.  (Tr. 283-84).  Plaintiff reported that her purpose in seeking the evaluation was to provide a basis for a court's reevaluation for custody of her three children.  (Tr. 283).  Plaintiff was divorced and living with her boyfriend.  (Id.)  Her ex-husband had custody of their children, aged twelve, ten and five.  (Id.)  Her longest period of employment was four years.  (Id.)  She had been married for nine years.  (Id.)

Plaintiff was asked to explain her erratic behavior that resulted in losing custody of her children.  (Id.)  Plaintiff said she had a ten-year history of erratic behaviors including spending sprees, arrests, highs and lows, promiscuousness, boredom and playing "mind games" with her ex-husband.  (Id.)  She reported that these episodes occurred three or four times a year and lasted one

or two months, and she subsequently was depressed. (Id.) Plaintiff reported that a psychiatrist diagnosed her with bipolar disorder in 2004 or 2005, but she could no longer see the psychiatrist due to "no shows." (Id.) Plaintiff reported feeling even and happy after being prescribed Depakote and Effexor at her last psychiatric visit six months ago. (Id.)

When asked about her daily routine, Plaintiff said she visited her mother, read, and liked to shop. (Tr. 284). She reported symptoms of unpredictability and "OCD." (Id.) Dr. Abrammi asked Plaintiff to return to complete the interview, but there are no additional medical records of an interview. (Id.)

Plaintiff presented to North Memorial on February 6, 2007, because she felt anxious and angry. (Tr. 325). She said her anger was from her relationship with her partner of seven months, but she would not provide details. (Id.) She felt like she was going to snap and that made her more anxious. (Id.) She felt like she might hurt her significant other but had no specific plan. (Id.) She also reported depression at a level of nine out of ten and fibromyalgia pain in her thighs and upper extremities. (Tr. 326). Plantiff's mental status was generally normal, but she admitted to suspicious and racing thoughts. (Id.) She was observed and remained calm throughout her stay and was discharged with instructions to follow up the next day. (Id.) Dr. Craig Matticks diagnosed adjustment disorder. (Id.)

On February 19, 2007, Plaintiff went to the Fairview University Medical Center emergency room for treatment of anxiety and stress. (Tr. 299). She reported being in an abusive relationship with her boyfriend. (Id.) Her mood and affect were normal. (Tr. 300). She was discharged to a shelter in stable condition. (Id.)

On February 28, 2007, Plaintiff went to the Hennepin County Medical Center emergency department for neck and back pain after she was assaulted a week earlier. (Tr. 392-93). She had just moved to a women's shelter. (Tr. 393). Her pain was at a level of seven out of ten. (Id.)

Plaintiff went to the Fairview-University emergency room on March 4, 2007, for evaluation of neck and back pain. (Tr. 334-37). Apart from tenderness, physical examination was normal. (Tr. 337). She was discharged to a shelter. (Tr. 338).

On April 12, 2007, Dr. R. Owen Nelson, a consulting psychologist, completed a Psychiatric Review Technique Form regarding Plaintiff at the request of the Social Security Administration ("SSA"). (Tr. 354-67). Based on his review of the record, Dr. Nelson opined that Plaintiff had affective disorders, anxiety-related disorders and personality disorders. (Tr. 354). He opined that these disorders resulted in mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and one or two episodes of decompensation. (Tr. 364). He did not find any evidence of the "C criteria" of the listings. (Tr. 365).

Dr. Nelson also completed a Mental Residual Functional Capacity form regarding Plaintiff. (Tr. 376-79). He opined that Plaintiff had the mental capacity to do the following things: concentrate on, understand, and remember routine, repetitive tasks, and three and four step, uncomplicated instructions; carry out tasks with adequate persistence and pace, if the tasks were routine, repetitive, and not detailed or complex; interact with co-workers and the public for brief, infrequent and superficial contact; follow an ordinary routine with the ordinary level of supervision found in most customary work settings; and tolerate the routine stresses of a routine, repetitive work setting. (Tr. 378). Dr. Ray Conroe affirmed Dr. Nelson's opinion on June 25, 2007. (Tr. 410-12).

On April 13, 2007, Dr. Aaron Mark completed a Physical Residual Functional Capacity form regarding Plaintiff at the request of the SSA. (Tr. 368-75). He opined that Plaintiff had the following exertional limitations from pain: occasionally lift and carry fifty pounds, frequently lift and carry twenty-five pounds, stand and/or walk for a total of six-hours in an eight-hour day, and sit six hours in an eight-hour day. (Tr. 369). He found no other limitations. (Tr. 370-73). Dr. Sandra Eames affirmed Dr. Mark's opinion on June 25, 2007. (Tr. 407-09).

Dr. Hogan wrote a "To Whom It May Concern" letter regarding Plaintiff on May 15, 2007. (Tr. 497). Dr. Hogan noted she had been seeing Plaintiff since January 2004, and Plaintiff's diagnoses were bipolar disorder, type II (probable), obsessive compulsive disorder, generalized anxiety disorder, PTSD, and histrionic borderline personality disorder. (Id.) She stated that Plaintiff was hospitalized multiple times, most recently in the fall of 2006, for paranoia, anxiety and depression. (Id.) Dr. Hogan opined Plaintiff was doing well at each of the following visits in 2007: February 1, March 12, April 4, and May 7. (Id.)

Plaintiff presented to an emergency room for fibromyalgia pain control on June 11, 2007. (Tr. 471). The pain was mostly in her arms. (Tr. 472). Plaintiff saw P.A. Hedlund one month later, and asked to have a form filled out for public assistance. (Tr. 464). Plaintiff reported her arm pain had increased, and she had difficulty carrying a purse and lifting groceries. (Id.) Hedlund recommended physical therapy. (Tr. 466).

Plaintiff again went to an emergency room on July 28, 2007, and reported she was assaulted by being grabbed around the neck and pushed to the ground. (Tr. 472). She had neck pain but no

fracture or dislocation.  (Id.)  Plaintiff reported she had a safe place to go that her boyfriend did not know about, and she reported the incident to the police.  (Tr. 473).

Plaintiff missed two appointments with Dr. Hogan in July and August. (Tr. 501).  On August 21, 2007, Dr. Hogan noted that Plaintiff was mildly depressed and anxious.  (Id.)  Plaintiff next saw Dr. Hogan on October 2, 2007, and reported a low stress level and fatigue, but she was not depressed or anxious.  (Tr. 500).  Dr. Hogan's impression was that Plaintiff's bipolar and OCD were in remission.  (Id.)  One month later, however, Plaintiff was depressed, fatigued and hypersomnolent. (Id.)  Dr. Hogan noted Plaintiff slurred her words but denied using alcohol or street drugs.  (Id.)  On objective examination, Plaintiff was calm, euthymic, and her affect was bright.  (Id.)  Dr. Hogan increased Plaintiff's Depakote.  (Id.)

On December 3, 2007, Plaintiff saw P.A. Hedlund with increased fibromyalgia pain and with weakness making it difficult to climb stairs and pick up grocery bags.  (Tr. 462).  Plaintiff was prescribed Lyrica, and Hedlund questioned whether Plaintiff had "true fibromyalgia" because arm and leg weakness were not consistent symptoms.  (Tr. 464).  Plaintiff reported she had an appointment pending in rheumatology. (Id.)  Hedlund completed a disability form for Plaintiff. (Tr. 467).

On December 10, 2007, Plaintiff had not started Prozac as prescribed and her moods were volatile, but she was not depressed.  (Tr. 499).  She was not sleeping well due to pain.  (Id.)  On objective examination, Plaintiff was calm, her affect was bright, and her mood was uniform.  (Id.) Dr. Hogan decided to hold Prozac and prescribe Lithium.  (Id.)

About a week later, Plaintiff went to an emergency room and reported left arm pain from fibromyalgia that was stronger than usual. (Tr. 475). Her physical examination was normal, and she did not appear distressed. (Id.) She was advised to take Ibuprofen. (Id.)

Plaintiff saw Dr. Hogan on January 15, 2008, and reported having hot flashes and anxiety, but she was not depressed. (Tr. 499). On objective examination, she was mildly anxious and tense but euthymic. (Id.)

On March 31, 2008, Plaintiff went to an emergency room and reported that her fibromyalgia pain was not alleviated with Neurontin. (Tr. 476). However, her pain had flared in her legs after she stopped taking Neurontin for two weeks. (Id.) She was not in distress, and her mood and affect were normal. (Tr. 477).

Plaintiff was seen for physical therapy evaluation on July 8, 2008, by Physical Therapist Mariah Ohlsen. (Tr. 490-93). Plaintiff's pain was in her neck and upper back, and her fibromyalgia pain was mostly in the thighs. (Id.) She reported pain at a level of ten out of ten. (Tr. 490). Plaintiff's range of motion tests were all normal. (Tr. 491-92). Ohlsen recommended a complete body exercise program. (Tr. 492).

In physical therapy on July 14, 2008, Ohlsen noted that although Plaintiff complained of increased pain after walking and carrying groceries the last couple of days, Plaintiff had no observable pain with movement. (Tr. 489). Plaintiff was able to perform exercises with good form. (Id.)

Plaintiff underwent a mental health diagnostic assessment with Social Worker Katie Shaw at Hennepin County Mental Health Clinic Nicollet ("HCMHC") on July 16, 2008. (Tr. 443). On mental status examination, Plaintiff was somewhat disheveled but appropriate. (Id.) She appeared

anxious, and her speech was somewhat delayed.  (Id.)  Her cognitive function was intact but somewhat blunted.  (Id.)  She did not know the date and her motor activity was somewhat restless. (Id.)

Plaintiff said she was depressed much of her life but significantly after her divorce.  (Tr. 444.)  She appeared either guarded or to have a minimal insight into her symptoms.  (Id.)  She reported emotional abuse in various relationships with men.  (Id.)  Plaintiff had a number of traumas in her childhood.  (Tr. 444-45).  Plaintiff described her strengths as being a good leader and organizer, a good worker who gets along with others and does her job to satisfaction, and her talents included playing piano, reading and playing volleyball and soccer.  (Id.)

When she was first diagnosed with fibromyalgia in 2004 or 2005, Plaintiff said she was bedridden and could not care for her children.  (Tr. 445).  She was also diagnosed as bipolar around this time.  (Tr. 446).  Her husband filed for custody, and she did not contest it.  (Tr. 445).  Plaintiff currently had visitation rights.  (Tr. 446).  She lost her apartment and her car was towed around the time she went to jail for violating a restraining order by having an argument with a neighbor.  (Tr. 446).  After losing her apartment in 2005, she was homeless for about a year.  (Id.)  She now resided in her own apartment.  (Id.)  Shaw diagnosed bipolar disorder, NOS [not otherwise specified] and major depressive disorder.  (Tr. 447).  She assessed a GAF score of 51-60.  (Id.)  Shaw referred Plaintiff for a psychiatric consultation.  (Id.)

On August 7, 2008, Plaintiff underwent a psychiatric consultation with Nurse Carol Wilson at HCMHC.  (Tr. 440-42).  Plaintiff reported that the combination of Depakote and Lithium had stabilized her mood.  (Id.)  She also reported that fibromyalgia triggered her depression.  (Id.)  Her recent symptoms were sad and irritable, lack of sleep, loss of energy, isolation, feeling worthless,

hopeless and guilty, difficulty concentrating and poor appetite.  (Id.)  She said her depression usually lasted a couple weeks.  (Id.)

Plaintiff reported having the following symptoms during a manic episode:  spending money, not sleeping, talking faster, jumbled thinking, taking more risks, irritable, on edge and angry.  (Id.)  This mood state could last up to a month.  (Id.)

Plaintiff reported she was diagnosed with PTSD after her divorce, but she was not currently having any symptoms of PTSD.  (Id.)  She also reported Dr. Hogan had diagnosed her with OCD for cleaning, counting cigarettes in a pack, wiping water spots out of the sink, and needing perfection with her home, children and lawn.  (Id.)  She denied anger problems or psychosis.  (Id.)

Plaintiff reported she had not had a manic episode for a year, and mostly she experienced depression.  (Id.)  When not medicated, she reported feeling restless and wandering the streets.  (Id.)  Plaintiff was diagnosed with fibromyalgia in 2000, and she found Cymbalta most helpful after trying many medications.  (Tr. 441).  On mental status examination, Plaintiff was depressed and her affect blunted, but her mental status was otherwise normal.  (Id.)  Wilson diagnosed bipolar I disorder by history and to rule out obsessive compulsive disorder.  (Id.)  She assessed a GAF score of 50.  (Id.)  Plaintiff requested to be seen and followed by a psychiatrist, so she was referred to Dr. Corby Benson.  (Id.)   Wilson listed Plaintiff's active problems as bipolar disorder NOS and major depression.  (Id.)

Plaintiff saw Dr. Beth Johnson at HCMC for evaluation of depression on August 28, 2008.  (Tr. 482).  Plaintiff said she was depressed for the last two months, which was unusual because she had been on the hypomanic/manic side of bipolar.  (Id.)  She was having passive suicidal thoughts without a plan.  (Id.)  Plaintiff denied side effects from medication and thought Cymbalta was

15

helpful.  (Id.)  Mental status examination was normal with the exception of depressed mood and restricted affect.  (Tr. 483).  Dr. Johnson recommended partial hospitalization.  (Tr. 482).

Plaintiff was evaluated in the partial hospitalization program on September 9, 2008, by Dr. Michelle Tichey.  (Tr. 516-17).  Plaintiff's stressors included ending a relationship and being in debt.  (Tr. 517).  She also suffered pain from fibromyalgia, had not worked since 2001, and did not have custody of her three children.  (Id.)  Plaintiff endorsed symptoms of depression, anxiety and mania.  (Id.)

Plaintiff's mental status examination was normal with the exception of depressed and anxious mood and restricted affect.  (Tr. 518-19).  She was cooperative, engaged and pleasant.  (Tr. 518).  Dr. Tichey diagnosed bipolar II disorder and depression-anxiety disorder, NOS.  (Tr. 519). She assessed a GAF score of 40.  (Id. )  Plaintiff was admitted into the partial hospitalization program, which consisted of group therapy in psychological education, occupational therapy, and therapeutic recreation.  (Tr. 520-23, 525-27, 531-37).

Two days later, Dr. Tichey assessed Plaintiff's progress.  (Tr. 523-25.)  Plaintiff's mental status examination was normal with the exception of the following: subjective report of depressed and anxious mood, thought process rapid, attention and concentration were fair.  (Tr. 524).  Plaintiff reported having difficulty focusing, and this was also observed by staff.  (Id.)  On mental status examination the next day, Plaintiff's concentration was much better, and she was less anxious and depressed.  (Tr. 528).  Plaintiff complained of chronic pain.  (Tr. 529).

Plaintiff withdrew from the program on September 19, after missing several days when her mother was admitted to the hospital.  (Tr. 535-40).  Plaintiff declined referrals because she felt fine. (Tr. 541).

Nurse Carol Wilson referred Plaintiff to Dr. Corby Benson for a psychiatric evaluation, which was performed on September 22, 2008. (Tr. 435-38). Plaintiff denied any significant side effects from medication. (Id.) Plaintiff felt her decreased mood was related to her mother's illness. (Id.) Plaintiff reported a history of obsessive compulsive disorder and stated that she counted everything. (Tr. 436).

On mental status examination, Plaintiff's mood was depressed, her concentration was limited, insight and judgment were fair, and memory was fair. (Id.) Dr. Benson diagnosed bipolar I disorder and obsessive compulsive disorder. (Id.) He assessed a GAF score of 55. (Tr. 437). He discontinued Plaintiff's Lithium but continued her other medications. (Tr. 438).

On October 13, 2008, Plaintiff told Dr. Hogan she had gone to HCMC because she was depressed for two months and not eating or sleeping. (Tr. 498). Her Lithium was increased, and she felt great. (Id.) Notably, she was cooking for herself and improved her diet. (Id.)

Plaintiff saw Katie Shaw at HCMHC for therapy on October 27, 2008. (Tr. 434). Plaintiff was fearful that winter was coming, and she might start isolating and become depressed. (Id.) She wanted referrals for group therapy. (Id.)

On November 7, 2008, Nurse Carol Wilson completed a Medical Opinion form regarding Plaintiff on behalf of Dr. Corby Benson. (Tr. 550). Wilson indicated that Plaintiff could not work for the foreseeable future, but would be reevaluated in three months. (Id.) She indicated that Plaintiff's diagnoses were bipolar disorder, OCD and fibromyalgia. (Id.) She completed this form again on January 23, 2009, but she dropped fibromyalgia from the list of diagnoses and did not include the notation "for Dr. Cory Benson," as on the previous form. (Tr. 552). Ms. Shaw completed the same form in a like manner on March 30, 2009. (554).

17

On November 25, 2008, Plaintiff saw Nurse Wilson for medication management.  (Tr. 432-33).  Plaintiff said her medications were working well, and although it was the time of year when she usually got depressed, she was walking more and taking care of herself.  (Tr. 432).  Plaintiff said her mood was even, but others said it was variable.  (Id.)  Plaintiff reported that other people said that she would be happy and content, and then snap at them.  (Id.)  Her mental status examination was normal, and she was assessed as stable.  (Id.)  Plaintiff's diagnoses were fibromyalgia, "referral diagnosis of bipolar I disorder," and obsessive compulsive disorder.  (Tr. 433).

On January 7, 2009, Plaintiff went to an emergency room after slipping on the ice and hurting her neck and right ankle.  (Tr. 545).  She was pleasant, cooperative, and in no distress.  (Tr. 546).  An x-ray showed extensive degenerative disc disease of the cervical spine but no fracture and reasonably well-maintained disc spaces.  (Tr. 547).  Plaintiff was treated for muscle spasm of the neck and ankle sprain.  (Id.)

Plaintiff saw Nurse Wilson during the drop-in clinic hours at HCMHC on January 23, 2009.  (Tr. 424-25).  Plaintiff complained of fibromyalgia pain but reported that her depression was improved and she felt overall stable.  (Tr. 424).  Her mental status examination was normal.  (Tr. 425).

Dr. Seymour Gross at HCMHC completed a case review consultation regarding Plaintiff on February 17, 2009. (Tr. 421-22.) He questioned whether the diagnosis of bipolar was correct.  (Id.)  He noted Plaintiff was participating in a new group called "Overcoming Anxiety & Depression."  (Id.)

On March 27, 2009, Plaintiff saw Nurse Wilson and asked her to complete a form. (Tr. 420-21). Plaintiff's mood was stable, and her mental status examination was normal. (Id.) Plaintiff said she was taking her medications as prescribed without side effects. (Id.)

## C.   Administrative Hearing

Plaintiff testified at an administrative hearing before ALJ David Gatto on May 28, 2009. (Tr. 24). Plaintiff testified as follows. She resigned from her last job because she was depressed and could not get out of bed. (Tr. 30). She was prescribed medication but did not take it and continued to be depressed. (Id.) She started taking her medications after her family took her to the hospital and tried to commit her. (Tr. 31). On a typical day, she watched the news, made meals, cleaned and took a nap. (Id.) When her fibromyalgia was bad, she stayed in bed. (Id.) She only went out to get food. (Id.) She did not like being around people because they irritated her. (Id.) She lived by herself. (Id.) Her driver's license was suspended because she never paid a fine that she owed. (Tr. 32). She rode the bus, but it was difficult because her legs hurt when she climbed the steps. (Id.)

Plaintiff said she missed some appointments with doctors because it was a long bus ride, and she would get lost trying to get there. (Tr. 33). She also had difficulty leaving her apartment. (Id.) Fibromyalgia made her everyday tasks difficult for her. (Id.) She could only lift a couple of pounds. (Id.) Side effects from medication for fibromyalgia made her sleepy. (Tr. 35). She stayed in bed much of the time due to fibromyalgia, and was lucky to get out of bed two or three days a week. (Tr. 35-36). Cymbalta helped her and was not causing side effects at the time of the hearing. (Tr. 36). She had manic episodes two to four days a month. (Tr. 35). Her manic episodes caused her to do careless things like spend a lot of money. (Id.) Plaintiff had a number of jobs in the past, but she

always had problems following through on things.  (Tr. 36).  Her various conditions would cause her to miss most days of work in a month.  (Tr. 37).

Dr. Steven Bosch testified as a vocational expert at the hearing.  (Id.)  The ALJ asked Bosch whether a person of Plaintiff's age, education, work history, and with impairments of fibromyalgia, bipolar disorder, panic disorder with agoraphobia, personality disorder with avoidant, borderline and anxiety features, and history of a thyroid problem could perform any work within the following limitations: medium exertional level work, unskilled work with brief and superficial contact with co-workers, no rapid or frequent changes in work routine to account for reduced stress tolerance, and brief and superficial contact with the public.  (Tr. 37-38).

Bosch testified that Plaintiff had past relevant work as a cashier, and some cashier jobs would fit that description.  (Tr. 38).  He also said her past relevant work as a mail sorter would fit that hypothetical situation.  (Id.)  Bosch further testified that there were other jobs consistent with the hypothetical, which included hand packaging, with 5,000 jobs in Minnesota; and janitor/cleaner work, with 10,000 jobs in Minnesota.  (Tr. 38-39).  Bosch also testified that if the person were instead limited to a light level of work, the cashier and mail sorting jobs would still be possible, as would some product assembly jobs, with approximately 20,000 such jobs in Minnesota.  (Tr. 39).  He said that if a person missed three or more days of work per month, she would not be competitively employable.  (Id.)  In response to a question by Plaintiff's counsel, Bosch testified that a person could not perform any of Plaintiff's past relevant work or any other work, if she were limited to lifting less than five pounds.  (Tr. 39-40).

## D.   Function Reports

On March 15, 2007, Plaintiff's significant other, Prentiss Trass, completed a "Function Report-Adult-Third Party" SSA form. (Tr. 159-66). He had known Plaintiff for one year and they watched television, ate meals and went for walks together. (Tr. 159). He described Plaintiff's daily activities as reading at the library and window shopping. (Id.) He said she could prepare meals but had trouble holding things. (Tr. 161). She could vacuum, dust and do dishes. (Id.) She went outside once a day, and walked or used public transportation. (Tr. 162). Her hobbies were television, playing the piano, reading and writing letters. (Tr. 163). Her social activities included eating meals and shopping with others three or four times a week, and going to church, the mall and the library on a regular basis. (Id.) She had trouble getting along with others, but she used to volunteer at church and her children's school. (Tr. 164). She did not get along well with authority figures. (Tr. 165).

Plaintiff completed the SSA form "Function Report-Adult" in May 2007. (Tr. 181-88.) She lived with a significant other. (Tr. 181). Her daily routine including watching television, vacuuming, doing dishes, going for a walk, and taking two naps. (Id.) She could not button or zip clothes or lift herself out of the bathtub. (Tr. 182). She cooked once a day. (Tr. 183). She could vacuum, dust, scrub walls and do household repairs. (Id.) She could not rake, lift bags of leaves or lift a laundry basket. (Tr. 184). She went outside once a day and could walk or use public transportation. (Id.) She shopped once a week for two hours. (Id.) She read once a day, watched television three to four hours a day, walked one hour a day, and played piano twice a week. (Tr. 185). She communicated with her children via the Internet and wrote letters twice a day. (Id.) On a regular basis, she went to a friend's house, church, and Caring Hands. (Id.) She attributed her

difficulty getting along with people to fibromyalgia.  (Tr. 186).  However, she said she got along

very well with authority figures.  (Tr. 187).

Plaintiff said she had terrible memory loss and could pay attention for twenty minutes.  (Tr.

186).  Physically, she could not squat, bend, kneel, climb stairs, walk more than a half block or stand

for a long time.  (Id.)  She could not handle stress or changes in routine.  (Tr. 187).

E.     **ALJ's Decision**

The ALJ found that the doctrine of res judicata applied to the issue of disability prior to July

26, 2006, the date of a prior final decision of the Commissioner denying Plaintiff's earlier

applications for DIB and SSI.  (Tr. 10).  In dismissing Plaintiff's new claims for disability benefits,

the ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the
       Social Security Act through December 31, 2006.

2.     The claimant has not engaged in substantial gainful activity
       since July 27, 2006, the alleged onset date (20 CFR 404.1571
       *et seq.*, and 416.971 *et seq.*).

3.     The claimant has the following severe impairments:
       fibromyalgia syndrome; Bipolar Affective Disorder; Panic
       Disorder with Agoraphobia; Obsessive Compulsive Disorder;
       and probable Personality Disorder, from borderline to anxiety
       (20 CFR 404.1520 (c) and 416.920(c)). . . .

4.     The claimant does not have an impairment or combination of
       impairments that meets or medically equals one of the listed
       impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20
       CFR 404.1525, 404.1526, 416.925, 416.926). . . .

5.     After careful consideration of the entire record, the
       undersigned finds that the claimant has the residual functional
       capacity to perform medium work as defined in 20 CFR
       404.1567(c)and 416.967(c) except unskilled work with brief
       and superficial contact with co-workers and the public; and,

no rapid or frequent changes in work routine to account for
reduced stress tolerance. . . .

6.      The claimant is unable to perform any past relevant work (20
        CFR 404.1565 and 416.965). . . .

7.      The claimant was born on January 18, 1970 and was 36 years
        old, which is defined as a younger individual age 18-29, on
        the alleged disability onset date.   (20 CFR 404.1563 and
        416.963).

8.      The claimant has at least a high school education and is able
        to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the
        determination of disability because using the Medical-
        Vocational Rules as a framework supports a finding that the
        claimant is "not disabled," whether or not the claimant has
        transferable job skills (See SSR 82-41 and 20 CFR Part 404,
        Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience,
        and residual functional capacity, there are jobs that exist in
        significant numbers in the national economy that the claimant
        can perform (20 CFR 404.1569, 404.1569a, 416.969 and
        416.969a). . . .

11.     The claimant has not been under a disability, as defined in the
        Social Security Act, from July 27, 2006 through the date of
        this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 13-22).

## III.   CONCLUSIONS OF LAW

### A.     Standard of Review

Disability is defined as "the inability to do any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12

months."  20 C.F.R. §§ 404.1505(a), 416.905(a).  In making a disability determination, the ALJ

must follow a sequential evaluation process which applies to both physical and mental disorders. 20 C.F.R. §§ 404.1520, 416.920 outline the five-step sequential process used by the ALJ to determine whether a claimant is disabled. At the first step, the ALJ must consider the claimant's work history. (Id.) At the second step, the ALJ must consider the medical severity of the claimant's impairments. (Id.) At the third step, the ALJ must consider whether the claimant has an impairment or impairments that meet or medically equal one of the listings in Appendix 1 to Subpart P of the regulations. (Id.) If the claimant's impairment does not meet or equal one of the listings in Appendix 1, at step four, the ALJ must make an assessment of the claimant's residual functional capacity and the claimant's ability to perform her past relevant work. (Id.) If the claimant can perform her past relevant work, the ALJ will find that she is not disabled. (Id.) If the claimant can not perform her past relevant work, the "burden of proof shifts to the Commissioner to prove, first, that the claimant retains the [RFC] to perform other kinds of work, and second, that other such work exists in substantial numbers in the national economy." Cunningham v. Apfel, 222 F.3d 496, 501 (8th Cir. 2000.)

Judicial review of the final decision of the Commissioner is restricted to a determination of whether substantial evidence on the record as a whole supports the decision. 42 U.S.C. 405(g); Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005) (quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000). In determining whether evidence is substantial, the court must consider both evidence that supports and evidence that detracts from the Commissioner's decision. Moore ex rel Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005). If it is possible to

draw two inconsistent positions from the evidence, and one of those positions represents the Commissioner's findings, the court must affirm the Commissioner's decision.  Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005).

Plaintiff memorandum in support of her motion for summary judgment contains five argument headings. These five headings, however, can be divided into two groups.  In her first two arguments, Plaintiff contends "[t]he ALJ erred in not accepting the treating doctors' opinions and replacing them with the opinions of non-treating, non-examining physicians" and that "the ALJ erred in finding that the record as a whole did not support the opinions of examining and treating doctors, and that the opinions and restrictions which they gave would make the claimant unable to work at a job on a regular and continuing basis."  Plaintiff's Memorandum in Support of Motion for Summary Judgment, pp. 9, 12 [Doc. No. 13].

Plaintiff's remaining three arguments implicitly suggest that Plaintiff meets or equals a listed mental impairment.  The Court will first address these last three arguments, which all concern the ALJ's determination at step three of the evaluation process, that Plaintiff did not meet or equal a listed mental impairment.  The Court will then address the weight the ALJ elected to give the various medical opinions in the record.

**B.      Substantial Evidence Supports the ALJ's Decision that Plaintiff Did Not Meet or Equal a Listed Impairment.**

The regulations provide that certain impairments are considered "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a) 416.925(a).  Such conditions are described in the Listing of Impairments, 20 C.F.R. § 404, Subpart P, Appendix 1.  Plaintiff has the burden of proof to establish that her impairment meets or equals a listing.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir.

2004) (citing <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530-31 (1990)).   A listing is met when an impairment meets all of the listing's specified criteria.   <u>Id</u>.  A finding that an impairment or combination of impairments does not meet or equal a listing must be based on medical evidence.  <u>Shontos v. Barnhart</u>, 328 F.3d 418, 424 (8th Cir. 2003) (quoting 20 C.F.R. § 404.1526(a) and (b)).

Once the ALJ determines that a claimant meets the paragraph A criteria of Listing 12.04, 12.06 or 12.08, Plaintiff must prove that her affective, anxiety and personality disorders, separately or together, resulted in at least two of the following:  marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration.  20 C.F.R. § 404, Subpart B, Appendix 1, §§ 12.04(b), 12.06(b), 12.08(b).  Marked is defined as more than moderate, but less than extreme.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(c).  "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitations is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis."  <u>Id</u>.

The state agency consulting psychologists reviewed the record and determined that Plaintiff had medically determinable impairments under Listings 12.04 affective disorders, 12.06 anxiety-related disorders, and 12.08 personality disorders.  However, they opined that Plaintiff did not meet the B or C criteria.   Under the paragraph B criteria, they determined that Plaintiff had mild limitations in activities of daily living, mild limitations in social functioning, and moderate limitations in concentration, persistence or pace.  (Tr. 354).  The ALJ agreed for the most part, but found Plaintiff had moderate limitations in social functioning.  (Tr. 13).

Plaintiff contends the ALJ misstated that she is able to care for herself and her children and erred in evaluating her daily activities.  Plaintiff also contends the ALJ ignored the fact that she is virtually out of control two to four days a month and in deep depression two to three weeks a month.

Defendant did not address the issue of Plaintiff not having custody of her children. Defendant contends there is no evidence other than Plaintiff's testimony that her manic phases were as frequent or severe as she claimed.  Defendant cites the disability reports completed by Plaintiff and her boyfriend as evidence that she had only mild restrictions in activities of daily living.

Plaintiff is correct that the ALJ erred in finding her able to care for her children, because she did not have custody and did not even have visitation rights during part of the relevant time period. However, Plaintiff lost custody well before her alleged onset date.  In July 2008, Plaintiff was living in her own apartment and was able to care for herself and the apartment.  She also had visitation rights with her children at that time.

The ALJ was correct that the disability reports completed by Plaintiff indicated she could cook, clean, shop, visit others, go to the library and church, use the Internet, and play piano.  On the other hand, while Plaintiff was in a manic phase before her August hospitalization, she engaged in reckless and dangerous behavior.  The ALJ essentially discounted this episode because it occurred when Plaintiff discontinued taking Depakote, and she stabilized when she restarted her medication. An impairment that can be controlled by medication is not disabling.  <u>Brown v. Astrue</u>, 611 F.3d 941, 955 (8th Cir. 2010) (quoting <u>Brace v. Astrue</u>, 578 F.3d 882, 885 (8th Cir. 2009)).

Furthermore, on August 7, 2008, Plaintiff reported that she had not had a manic episode for a year.  (Tr. 440).  There is no evidence of a manic episode after Plaintiff's August 2006 hospitalization. The only evidence of Plaintiff having severe depression was in August 2008, when

27

Plaintiff had suicidal ideation without a plan, which quickly improved with change in medication and partial hospitalization.  At all other times, her anxiety and depression were mild to moderate. Therefore, the ALJ did not err in discounting Plaintiff's testimony about having weekly manic episodes followed by deep depression lasting two or three weeks a month.

Plaintiff had two episodes of decompensation during the relevant time period, and the ALJ recognized this.  Other than during these episodes of decompensation, the record supports the ALJ's finding that Plaintiff had mild restrictions in daily activities.

Plaintiff also contends her social functioning was more than moderately impaired.  Again, she cites her testimony about the frequency and severity of her manic and depressive episodes.  As discussed above, there is no evidence in the record to support her testimony about the frequency of severe symptoms. Apart from her manic phase leading up to her August 2006 hospitalization, Plaintiff rarely exhibited any difficulty getting along with others throughout the remainder of the medical records.  She always appeared pleasant and cooperative to many treatment providers.  She said in her disability report that she regularly saw friends and went to church.  (Tr. 185).  She also described her strengths as being a good leader, organizer, getting along with others and doing her job to satisfaction.  (Tr. 445).  She did well in group therapy during the partial hospitalization.  (Tr. 520-23, 525-27, 531-37).  The overall evidence in the record supports the ALJ's finding that Plaintiff's social functioning was only moderately impaired.

Plaintiff also suggests her concentration, persistence and pace are more than moderately impaired.  She cites her testimony that she would get lost when trying to learn bus routes, that she can not finish a book, that she stays in bed when her fibromyalgia is bad, and her medication makes her sleepy.  Her testimony, however, is contrary to her many mental status examinations.  During

partial hospitalization, she was once noted to have deficits in concentration, but she was noted to be better the next day. (Tr. 524, 528). The only difficulty she ever reported to providers about using the bus was that it took her a long time to travel from Dakota County. (Tr. 287). She and her boyfriend indicated, in the disability reports they completed, that she could use public transportation. (Tr. 161, 184). Furthermore, Plaintiff never reported to any treating source that her medication made her sleepy. Therefore, substantial evidence in the record supports the ALJ's determination that Plaintiff had only moderate limitations in concentration, persistence or pace, and she did not meet the criteria for a listed impairment.

### C.      Substantial Evidence Supports the ALJ's Decision To Grant the Greatest Weight to the Non-examining Physicians' Opinions

Plaintiff contends the ALJ disregarded the opinions of long-treating physicians and psychiatrists including Drs. Hogan, Benson, Anderson and Michell and various doctors who treated her when she was in the hospital for a week in August 2006, including Dr. Philander. Plaintiff points to Dr. Philander's statement summarizing that she was brought to the hospital for decompensation of bipolar disorder due to rapid mood swings, dangerous-like behavior, homelessness, and losing custody of her children. She also cites the Medical Opinion forms, which indicated she could not work for the foreseeable future. And Plaintiff cites Dr. Hogan's note from April 26, 2006, that Plaintiff definitely qualified for SSDI because of her disorganization and depression. The ALJ gave greater weight to the opinions of the non-examining state agency physicians and psychologists. Plaintiff correctly cites precedent that opinions of non-examining physicians ordinarily do not constitute substantial evidence on the record as a whole.

Plaintiff further contends that the record as a whole supports her treating and examining providers' opinions. Plaintiff cites her testimony regarding the frequency and severity of her manic

29

phases.  The Court has addressed this and found the record as a whole does not support Plaintiff's

testimony that she had manic episodes lasting three or four days, several times a month or severe

depression following frequent manic episodes.  The Court will address the remainder of the evidence

in the record below.

Defendant contends the ALJ correctly determined that Ms. Hedlund, Ms. Shaw, and Ms.

Wilson were not acceptable medical sources under the regulations; and therefore, their opinions

were not entitled to the deference of a treating physician's opinion.  Defendant is correct that only

acceptable medical sources, as defined in 20 C.F.R. § 404.1513, can be considered treating sources

whose opinions may be entitled to controlling weight under 20 C.F.R. § 404.1527(d)(2).  See Sloan

v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007) (citing Social Security Ruling (SSR) 06-3p, 71 Fed.

Reg. 45,593 (Aug. 9, 2006)).  Physician assistants, social workers and nurses are not "acceptable

medical sources."  20 C.F.R. § 404.1513(a).  They are "other medical sources," and evidence from

them may be used to show the severity of a claimant's impairment and how it affects his or her

ability to work.   20 C.F.R. § 404.1513(d).

SSR 06-3p directs that:

> [D]epending on the particular facts in a case, and after applying the
> factors for weighing opinion evidence, an opinion from a medical
> source who is not "an acceptable medical source" may outweigh the
> opinion of an "acceptable medical source,' including the medical
> opinion of a treating source.  For example, it may be appropriate to
> give more weight to the opinion of a medical source who is not "an
> acceptable medical source" if he or she has seen the individual more
> often than the treating source and has provided better supporting
> evidence and a better explanation for his or her opinion.

Sloan, 499 F.3d at 889.  The factors for considering opinion evidence include: 1) how long the

source has known and treated the claimant; 2) how consistent the opinion is with other evidence; 3)

the degree to which the source presents relevant evidence to support an opinion; 4) how well the source explains the opinion; 5) whether the source has a specialty related to the individual's impairment; and 6) any other factors that tend to support or refute the opinion.  Id.; 20 C.F.R. § 404.1527(d)(2).

Plaintiff argues that Dr. Benson supervised Shaw and Wilson and confirmed their opinions. Defendant contends the only evidence in the record supporting this assertion are the words "for Dr. Corby Benson" under Wilson's signature on a November 2008 Medical Opinion form.  The Court assumes this notation meant Nurse Wilson completed the form on behalf of Dr. Benson, and that it is consistent with his opinion.  The Court will review it as a treating physician's opinion, and will review the other Medical Opinion forms as opinions from "other medical sources."

Defendant also argues that Drs. Hogan, Anderson, Michell, Philander and other physicians who saw Plaintiff during her hospitals stays did not offer any opinion on disability or provide functional assessments.  The Court agrees, with the exception of Dr. Hogan's April 2006 statement that Plaintiff qualified for SSDI.  The Court will review Dr. Hogan's statement as a treating physician's opinion.  The other physicians' and pyschologists' notes are reviewed as part of the treating record to determine whether they are consistent with the Medical Opinion forms.

Thus, the Court's task is to determine whether Dr. Benson's or Dr. Hogan's opinions are entitled to controlling weight as her treating psychiatrists or whether Hedlund's, Shaw's or Wilson's opinions are entitled to greater weight than the non-examining state agency psychologists' and physicians' opinions.

A treating physician's opinion is typically entitled to controlling weight if it is "'well-supported by medically acceptable clinical and laboratory and diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] record.'"  Leckenby v. Astrue, 487 F.3d

626, 632 (8th Cir. 2007) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000)

(quoting 20 C.F.R. § 404.1527(d)(2)).  "An ALJ may discount such an opinion if other medical

assessments are supported by superior medical evidence, or if the treating physician has offered

inconsistent opinions."  Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001).  A non-

treating physician's assessment, when the physician has not examined the claimant, normally

does not constitute substantial evidence on the record as a whole.  Vossen v. Astrue, 612 F.3d

1011, 1017 (8th Cir. 2010).  However, there are circumstances "in which relying on a non-

treating physician's opinion is proper."  Id.

> ### 1.      Dr. Hogan's opinion of April 2006 is not entitled to controlling weight.

Dr. Hogan's April 2006 statement that Plaintiff met the SSDI requirements based on

disorganization and depression is not entitled to controlling weight because it is inconsistent with

other substantial evidence in the record.  The statement was accurate and consistent with the

record when it was made, but it was made three months before Plaintiff's alleged onset date of

July 27, 2006, and before that date, the ALJ found res judicata applied to a finding of no

disability.  Plaintiff improved after her week long hospitalization in August 2006, and there is no

evidence in the record of another manic episode through March 2009.  In May 2007, Dr. Hogan

noted Plaintiff had been doing well for the past several months.  Plaintiff's severe depression in

2008 was brief, with a GAF score of 50 on August 7, 2008, and much improvement after ten

days of partial hospitalization, ending on September 19, 2008.  The record does not support a

twelve-month period when Plaintiff's impairments were severe enough to be disabling or that

they would have been expected to be disabling for twelve months, given her positive response to

medication and therapy.  See Knudsen v. Barnhart, No. C02-4108, 2003 WL 22959818 at *18

(N.D.Iowa Dec. 16, 2003) (affirming ALJ where there was no evidence that bipolar episodes of

decompensation were of extended repetitive periods during any consecutive 12-month period).

>           **2.      Dr. Benson's opinion of November 2008 is not entitled to controlling
>                     weight.**

Nurse Wilson completed a Medical Opinion form on Dr. Benson's behalf in November

2008, and indicated Plaintiff could not work for the foreseeable future due to fibromyalgia,

OCD, and bipolar disorder.  As discussed above, Plaintiff's bipolar ranged from mild to

moderate with the exception of two short episodes of decompensation.  There is no evidence that

Plaintiff's OCD caused any functional limitations.

The November 2008 Medical Opinion form also took Plaintiff's fibromyalgia into

account.  However, on the occasions when Plaintiff complained of severe fibromyalgia pain,

treatment providers noted she did not appear to be in pain or distress.  (Tr. 489, 404-05, 475,

477).  She never had limited range of motion or muscle weakness.  Despite her complaint of

severe pain, she had no difficulty performing exercises in physical therapy.  (Tr. 489-92).  On

several occasions, she reported doing a lot of walking.  (Tr. 185, 246, 432).  When Nurse Wilson

and Katie Shaw completed subsequent Medical Opinion forms, they did not include fibromyalgia

under the diagnoses.  (Tr. 552, 554.)  Overall, when fibromyalgia is considered together with

Plaintiff's mental impairments, the record does not support Dr. Benson's opinion of disability.

>           **3.      P.A. Hedlund's, Dr. Hogan's, Dr. Benson's, Social Worker Shaw's
>                     and Nurse Wilson's opinions are not entitled to greater weight than
>                     the nonexamining state agency physicians' and psychologists'
>                     opinions.**

In October 2006 and December 2007, P.A. Hedlund completed Medical Opinion forms and indicated Plaintiff was unable to work due to chronic fibromyalgia pain and weakness and mood instability.  (Tr. 467.)  As noted above, the record is inconsistent with a disabling level of pain, and there was no evidence of weakness on any physical examination.  Plaintiff's daily activities were also inconsistent with severe pain.  As discussed above, the record as a whole is inconsistent with a disabling level of mood instability.  Therefore, the ALJ did not err in giving little weight to Hedlund's opinion.

Defendant correctly points out that none of the three opinions provided on the Medical Opinion forms by Dr. Benson, Shaw and Wilson include an explanation as to why Plaintiff could not work or her specific functional limitations.  Defendant also asserts these opinions were inconsistent with the sources' treating notes and the entire record.   Of course, all of the factors concerning the length and nature of the treating relationship between Plaintiff and any treating or examining provider favor granting more weight to their opinions than the non-examining state agency consultants.  However, none of the medical source opinions are consistent with the record as a whole, none of their opinions contain a functional assessment, and the Medical Opinion forms contain no explanation for the opinions.  On the other hand, Dr. Nelson and Dr. Mark provided evidence from the record in support of their opinions (Tr. 366, 369), and their opinions are consistent with the record as a whole as described below.

The record indicates that between Plaintiff's hospitalization and partial hospitalization, Plaintiff saw Dr. Anderson for psychiatric evaluation in September 2006, for the purpose of obtaining custody of her children.  (Tr. 285-87).  Objectively, Plaintiff's mental status examination was essentially normal, even though she had run out of her antidepressant three

34

weeks earlier.  (Id.)  Plaintiff was still homeless, and Dr. Anderson assessed a GAF score of 50.

(Id.)  Plaintiff went back on the antidepressant Effexor, and when she saw Dr. Ebrammi in

December 2006, she said her mood had evened out and she was happier on the combination of

Effexor and Depakote.  (Tr. 283).

In February and July 2007, Plaintiff was treated for anxiety and stress, which was related

to being abused by her boyfriend.  (Tr. 300, 473).  However, in a letter dated May 15, 2007, Dr.

Hogan stated that Plaintiff was doing well at all of her visits in February through May 2007.  (Tr.

497).  When Plaintiff returned to see Dr. Hogan in August, Plaintiff was mildly depressed.  (Tr.

501).  In October, Dr. Hogan's impression was that Plaintiff's bipolar and OCD were in

remission.  (Tr. 500).  One month later, Plaintiff complained of depression and fatigue, but on

objective examination, Plaintiff was calm, euthymic, and her affect was bright.  (Id.)  Plaintiff's

depression and anxiety continued to be mild in December 2007 and January 2008.  (Tr. 499).

By July 2008, Plaintiff had moved into her own apartment.  (Tr. 443-45).  She had some

objective signs of anxiety, and in an initial evaluation, Social Worker Katie Shaw assessed her

GAF score as 51-60.  (Id.)  Plaintiff had two other initial psychological evaluations in August

2008, one with Nurse Carol Wilson, who assessed a GAF score of 50, and one with Dr. Beth

Johnson, who recommended partial hospitalization due to Plaintiff's reported depression for the

last two months.  (Tr. 440-42, 482-83).  Plaintiff left the partial hospitalization after ten days

because her mother was in the hospital, but she said she was improved and felt fine.  (Tr. 535-

41).  Just days after she left the program, Plaintiff had a psychiatric examination with Dr. Corby

Benson, who assessed a GAF score of 55, indicating only moderate symptoms.  (Tr. 435-38).

When Plaintiff saw Dr. Hogan in October, she said she felt great and attributed it to her Lithium

being increased.  (Tr. 498).  In November, Plaintiff's mood was even and her mental status

examination was normal.  (Tr. 432).  In March 2009, Plaintiff's mood continued to be stable and

her mental status examination was normal.  (Tr. 420-21).  For all of the reasons discussed above,

substantial evidence in the record supports the ALJ's decision to grant the greatest weight to the

opinions of the state agency consulting physicians and psychologists that Plaintiff could perform

medium, unskilled work with limited contact with people and no rapid or frequent changes in

work routine.  Furthermore, due to Plaintiff's usually mild to moderate limitations, with

infrequent, short episodes of decompensation, the record as a whole does not support a finding

that Plaintiff would miss three or more days of work a month.  Therefore, the Court recommends

affirming the ALJ's decision.

## IV.   RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY**

**RECOMMENDED THAT:**

1.      Plaintiff's Motion for Summary Judgment (#12) **be DENIED**;

2.      Defendant's Motion for Summary Judgment (#18) **be GRANTED**;

3.      The case be **DISMISSED WITH PREJUDICE AND JUDGMENT BE**

        **ENTERED.**


DATED: <u>May 25, 2011</u>

                                        <u>*s/ Franklin L. Noel*          </u>
                                        FRANKLIN L. NOEL
                                        United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before June 8, 2011, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof.  A party may respond to the objecting party's brief within 14 days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words.  A district court judge shall make a de novo review of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.